UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LILLIAN BASON,

                 Plaintiff,               CIVIL ACTION NO. 12-15033

       v.                           DISTRICT JUDGE GERSHWIN A. DRAIN

                                       MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 18)**

       Plaintiff Lillian Bason challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 13, 18). Judge Gershwin A. Drain referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2).

**I.      RECOMMENDATION**

       Because the Administrative Law Judge ("ALJ") did not err in his Step Three analysis or in his assessment of Plaintiff's credibility, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

-1-

II.     **DISCUSSION**

   A. *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and

Supplemental Security Income are available only for those who have a "disability." *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment, which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Act has promulgated

regulations that provide for the payment of disabled child's insurance benefits if the claimant is

18 years old or older and has a disability that began before attaining age 22. *See* 20 C.F.R.

404.350(a)(5).

   The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

   Step One: If the claimant is currently engaged in substantial gainful activity,
   benefits are denied without further analysis.

   Step Two: If the claimant does not have a severe impairment or combination of
   impairments that "significantly limits . . . physical or mental ability to do basic
   work activities," benefits are denied without further analysis.

   Step Three: If the claimant is not performing substantial gainful activity, has a
   severe impairment that is expected to last for at least twelve months, and the
   severe impairment meets or equals one of the impairments listed in the

-2-

regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499

-4-

F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.  *Administrative Proceedings*

Plaintiff applied for child's disability insurance benefits on June 29, 2009 and supplemental security income on June 24, 2009, alleging a disability onset date of July 1, 2008; the Commissioner denied the application (Tr. 12). Plaintiff appeared with counsel for a hearing before ALJ Michael F. Wilenkin, who considered the case *de novo* (*Id.*). In a written decision, ALJ Wilenkin found Plaintiff was not disabled (Tr. 12-23). Plaintiff requested an Appeals Council review (Tr. 7-8). On September 13, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-4).

### B.  *ALJ Findings*

Plaintiff had not attained age 22 as of July 1, 2008, her alleged onset date (Tr. 14). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her alleged onset date in 2008 (*Id.*).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: cognitive disorder not otherwise specified, associated with low IQ scores and some depressed mood (*Id.*).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 16-17).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: no more than simple, routine type activities, no executing of more than 1-3 step instructions given by demonstration or learned by hands on activities, no requirements for independent judgment or decision making and no verbal mediation or problem solving required.

(Tr. 17-22).

At step four, the ALJ found that Plaintiff had no past relevant work (Tr. 22).

At step five, the ALJ found Plaintiff was not disabled, because she could perform a significant number of jobs in the national economy, such as inspector, product assembler, or packager (Tr. 22-23).

### C.  Administrative Record

#### 1.       Hearing Testimony and Statements[1]

##### a.  Plaintiff's Testimony

When Plaintiff was nine years old, she was injured in a car accident; she does not remember the accident, only her time in the hospital (Tr. 39).

---

[1] Testimony before the ALJ reflects Plaintiff and her mother's subjective view of Plaintiff's medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

Plaintiff repeated the eighth grade.[2] At age 18, she reached the ninth grade (Tr. 36).[3] Plaintiff completed part of the ninth grade at Denby High School (a Detroit public school), and the remainder at Covenant House (also referred to as Life Skills Academy) (Tr. 36-37). Plaintiff was in both regular and special education classes; she learned to write, but is not good at reading

---

[2] Whether Plaintiff had to repeat it twice was unclear:

Q: . . . [D]id you have to repeat a whole year of school at any time?

A: Yes.

Q: Okay. Do you remember what year?

A: My eighth-grade year.

Q: Eighth grade. Did you have to repeat something more than one time?

A: Yes.

Q: Do you remember what grade that was?

A: No.

Q: Did you repeat eight grade two times or you don't remember? I don't want to put words in your mouth? Do you remember?

A: No.

(Tr. 37-38).

[3] Plaintiff turned 19 during ninth grade and stopped going to school at age 20, a few months before her hearing (Tr. 37).

-7-

(Tr. 30). She enrolled in Covenant House to finish her high school studies, but dropped out because she could not understand her classes; the work was too hard (Tr. 30-31, 36-38).

Plaintiff cannot work because she gets headaches at her temples approximately three times a day for five minutes at a time (Tr. 31). When asked what she does about the headaches, she responded "[n]othing, sleep" (Tr. 32). She does not take any medications and does not know what causes them (*Id*.). Plaintiff forgets to mention her headaches to doctors, although she has told her mother about them (Tr. 39-40).

Plaintiff also has lower back pain that was caused by a car accident "some years ago" (though the pain did not begin right away) (Tr. 32-34).[4] She cannot stand for long, because she

---

[4] Plaintiff appeared to have difficulty estimating the amount of time it had been since her car accident. When pressed, she stated it was two or three years ago:

Q: How long ago did you injure your back?

A: For a while.

Q: I'm sorry?

A: For a while.

Q: When did you sustain the injury? Was it a couple of years ago, was it last week or, I don't know.

A: Some years now.

Q: I'm sorry?

A: Some years now.

-8-

feels an aching pain that comes and goes (it is not triggered by anything in particular) (Tr. 32-33). She has never talked to a doctor about her back pain (Tr. 34).

No other medical problems prevent Plaintiff from working (Tr. 34-35).

Plaintiff lives in a flat with her mother and brother (Tr. 29-30). She does not drive; has no recreational interests or hobbies; is not active with any organizations; and, has no friends (Tr. 30, 35-36, 42). Plaintiff has no difficulty taking care of her personal needs (Tr. 34-35). But she does not help her mother with chores because she forgets to complete whatever is asked of her; even if her mother is standing right next to her, Plaintiff will "walk off and do something else" (*Id.*). She spends her time at home watching television and playing games on the computer; she plays checkers, for example, but plays only half of a game – usually for no longer than five minutes – because she loses focus and becomes irritated (Tr. 35-36, 40-42).

Plaintiff's mother was abused; Plaintiff recalls blood smeared on the walls as a youth and becomes emotional when she looks at her mother (Tr. 41-42). Plaintiff thinks about what happened to her mother daily (Tr. 41). She has never seen a therapist or social worker to talk about it (Tr. 41-42).

---

Q: Approximately how many?

A: Maybe two or three.

(Tr. 32-33). But, when examined by her counsel, Plaintiff stated she had been referring to the car accident that occurred when she was approximately 9 years old (Tr. 39).

### b. *Plaintiff's Mother's Testimony*

When Plaintiff was in a car accident as a child, she was thrown from the vehicle and suffered head trauma (Tr. 48-49). Plaintiff remained in intensive care for two days; she did not awaken until the second day, after her kidneys failed and she had to go into surgery (*Id.*).

Plaintiff's mother, Judith Bason ("Ms. Bason"), admitted it was unusual that Plaintiff was 18 years old when she reached the ninth grade, but explained that, at the time, she had not given it much thought: Ms. Bason "was going through a bad time" in her life (Tr. 44). When Plaintiff turned 18, Denby school officials told Ms. Bason that Plaintiff was too old to continue attending; Ms. Bason put Plaintiff in Covenant House, an alternative school, so she could complete high school (Tr. 44-45). Plaintiff began Covenant House in regular classes, but Ms. Bason realized she needed to figure out what was wrong with Plaintiff; she had her tested, and Plaintiff was found to have a learning disability (*Id.*). She was then placed in special education classes (*Id.*).

Plaintiff attended Covenant House for approximately a year and a half, and, although she enrolled in the September before her hearing, she stopped attending classes (Tr. 45). Ms. Bason explained that this was because of Plaintiff's difficulty in school: she was not doing well, even in her special education classes (Tr. 46).

Plaintiff's counsel then asked whether there had been any attempt to help Plaintiff find a job:

> A: There have been thoughts, but she have [sic] difficulty filling out the applications. She get [sic] moody. And yes, there have been thoughts.

-10-

Q: Okay. What do you mean she gets moody? Can you describe some of her behaviors?

A: She have [sic] different – I'll get an application for her and she don't [sic] want to fill it out. She want [sic] me to fill it out. I tell her I can't fill it out for her. She have [sic] to fill it out. She get moody, she tear [sic] it up. You know, like she don't [sic] understand it. I tell her I'll help her. She'll say, well, that's not going to help me at the workplace. You know, so I say well, she got [sic] to do it herself the best way she can. She just get [sic] moody.

(Tr. 46-47).

When Ms. Bason asks Plaintiff to do things around the house, Plaintiff talks back, stomps her feet, and slams her bedroom door (Tr. 47). Ms. Bason must ask Plaintiff repeatedly to complete chores; Ms. Bason eventually becomes angry and stands over Plaintiff to make sure she does what she is asked of her (*Id*.). If Ms. Bason gives in and starts to, for example, do the dishes herself, Plaintiff will return to the kitchen and say she forgot (*Id*.). Plaintiff is also unable to follow directions: "I can ask her to go get something for me. I mean, I know where I put things and I can ask her – tell her step by step and she won't see it and it'll be right there" (Tr. 48). Plaintiff cannot follow a recipe or help with cooking; if Ms. Bason asks Plaintiff to watch chicken that is cooking, Plaintiff will forget to do it – it becomes a "safety concern" (*Id*.). Ms. Bason also notices that Plaintiff does not pay attention when she watches TV; Plaintiff's mind wanders (Tr. 50). Ms. Bason does not know what is wrong with her daughter (Tr. 48).

Plaintiff recently began telling Ms. Bason about her headaches and problems with her leg (it sometimes goes out when she is walking) (Tr. 49-51). When Plaintiff has a headache, she goes to sleep (Tr. 50). Sometimes, Plaintiff will sleep throughout the day and Ms. Bason must

-11-

wake her up for meals (*Id.*). Ms. Bason tries to keep Plaintiff busy during the day, because if she sleeps all day, she will stay up all night (*Id.*).

Ms. Bason was not aware of Plaintiff's difficulty dealing with the memories of Ms. Bason's abuse (Tr. 51). She has never seen Plaintiff cry, nor has anyone ever suggested that Plaintiff see a therapist (*Id.*).

## 2.     Medical Evidence

On December 3, 1999, Plaintiff presented to the emergency room following a motor vehicle accident; she was ejected from the backseat of a vehicle (she had been unrestrained), lost consciousness, and – most significantly – suffered extensive injury to her liver and a closed head injury (subarachnoid hemorrhage) (Tr. 176, 183-85, 223). A neurologic exam revealed normal cranial nerves; DTRs equal and symmetrical bilaterally; and, normal sensation (Tr. 184). Imaging studies of Plaintiff's head revealed unusual findings of unilateral sylvian fissure density (probably representing blood) and a small nondisplaced linear fracture at the site of the soft tissue swelling (Tr. 208-11). Imaging studies were also taken of Plaintiff's cervical spine, chest, and pelvis (Tr. 176). X-rays revealed obliteration of C7, but gross alignment and no soft tissue swelling (Tr. 183). Plaintiff was transferred to the Children's Hospital with a Glasgow coma

score of 15 (Tr. 185, 197).[5] She was discharged in stable condition on December 8, 1999 (Tr. 225).

On March 19, 2004, Plaintiff – then 13 years old and in the sixth grade – presented to James Chinarian, M.D., complaining of school difficulty (Tr. 205-07). Plaintiff, accompanied by her mother and a case manager, said that her school difficulty seemed to date back to her 1999 motor vehicle accident (Tr. 205). She reported doing well in school before then (*Id*.). Once she returned to school (after the holidays that year), she seemed to do fine through completion of the third grade; however, problems began to surface during the fourth grade (*Id*.). Plaintiff's grades declined and she was forced to repeat the fourth and fifth grades; she was eventually promoted to sixth grade, but stated that she had not performed adequately that year either (*Id*.). During this time, Plaintiff's family had moved, forcing her to attend a number of different schools; Dr. Chinarian stated that this may have contributed to her struggles (Tr. 206). But Plaintiff had not had behavioral difficulties: her problems were purely academic (*Id*.). Plaintiff reported headaches over the previous months (*Id*.). They came on when she was playing or concentrating hard; typically occurred once a month; lasted a few minutes; and, were not associated with

_____

[5] "The Glasgow Coma Scale (GCS) is the most common scoring system used to describe the level of consciousness in a person following a traumatic brain injury" in order to "gauge the severity of an acute brain injury." *See* http://www.brainline.org/content/2010/10/what-is-the-glasgow-coma-scale.html (last accessed February 17, 2014). It is a 15 point scale, where a score of 13-15 indicates mild brain injury. *Id*. "Mild brain injuries can result in temporary or permanent neurological symptoms and a neuro-imaging tests such as CT scan or MRI may or may not show evidence of any damage." *Id*.

-13-

nausea, vomiting, or vision changes (*Id.*). Plaintiff lies down for relief (*Id.*). She told Dr. Chinarian that her headaches were the reason why she struggled in school, but he did not think that was the case due to their infrequency (once a month) (*Id.*). On exam, Plaintiff was cooperative and comfortable, but quiet and soft spoken; a neurological exam showed intact cranial nerves with no focal deficits (Tr. 206-07). Dr. Chinarian found it difficult to assign Plaintiff's school troubles to her head injury, because he believed third grade to frequently be the time period when school problems first arise and Plaintiff had completed the third grade adequately (Tr. 207). But, he noted, "considering [Plaintiff] had a subarachnoid hemorrhage she did have true injury in spite of a good Glasgow coma score" (*Id.*). Plaintiff was referred for neuropsychological testing (*Id.*).[6]

On September 30, 2009, Plaintiff presented to Nick Boneff, Ph.D., for a consultative examination; she was in the tenth grade (Tr. 154-57). Plaintiff reported difficulty with math and reading, and a bad memory (Tr. 154). She reported being depressed growing up because her mother was abused by men, and denied any history of psychiatric hospitalization or outpatient psychotherapy or counseling (*Id.*). Plaintiff got along okay with others, and kept to herself when she felt down (*Id.*). She liked to dance and watch TV; she used to play with friends and go to the mall, but could no longer do those things (Tr. 155). On a typical day, Plaintiff woke up at 8:00 a.m., went to school, watched television, and went to bed around 9:00 p.m.; she was not assigned homework (Tr. 155). She could not drive (when she needed to go somewhere, she took the bus or

---

[6] It is unclear whether such an examination took place; no records related to such an examination are in the record.

her mother drove her); bathed every day; and, could not manage money (*Id*.). Plaintiff needed

help finding the office the day of her examination; she called for directions numerous times (*Id*.).

A mental status evaluation revealed adequate overt contact with reality; no evidence of an overt

thought disorder; no exaggeration or minimization of symptoms; and, logical, goal-directed

stream of mental activity (no loose, circumstantial or tangential associations) (*Id*.). Plaintiff

stated she sometimes hears noises in her room; sometimes feels others are plotting against her;

denied suicidal thoughts, feelings, or attempts; denied believing she has magical or unusual

powers; most often felt depressed; did not know the name of the doctor's office; was able to

repeat four digits forwards and three digits backwards, and three of three objects immediately

(immediate memory); recalled one of three objects after a three-minute delay (recent memory);

could recall only the current president (past memory); stated "fires" in response to questions

about current events; and, stated "no" when asked for specific events (Tr. 155). She performed

the following calculations: serial 7's from 100 ("90"); 4 + 7 = 12; 16-9 = 6; 4 x 6 = "I don't

know"; and, 42/7 = "I don't know" (Tr. 156). Intelligence testing revealed Plaintiff's intellectual

functioning to be in the mildly retarded range; she had a verbal IQ of 65, performance IQ of 69,

and full scale IQ of 64 (*Id*.). Dr. Boneff diagnosed cognitive disorder, NOS (no documentation

available of current mildly mentally retarded level of intellectual functioning as existing prior to

age 18); victim of childhood trauma (reports of mother having been abused); and, adjustment

disorder with depressed mood (Tr. 156-57). He assessed a GAF score of 49 and found her

-15-

prognosis to be fair (*Id.*).[7] He concluded that Plaintiff presented with only limited cognitive strengths; had problems with attention and concentration as evidenced by difficulties in calculations; was capable of engaging in simple work type activities (remembering and executing a two or three step procedure on a sustained basis with no capacity for independent judgment or decision making required); and, would probably be best at hands on activities that did not require verbal mediation or problem solving (Tr. 157).

On October 14, 2009, Charles Lawrence, Ph.D., completed a "case analysis" and mental impairment review (Tr. 159). He summarized the findings of Dr. Boneff, and found they were not representative of Plaintiff's capabilities:

> Dr. Boneff felt that the claimant had made a good effort in testing, and thus suggested the scores were accurate and valid. But there are indications that this was not the case. First, the claimant has no history at all of special education, as reported during the interview process in the field office. A person whose intelligence is accurately measured at FSIQ64 would definitely have a history of special education. Second, the claimant made some errors in MSE tests that are suspicious. She gave 12 as the sum of 4+7, just 1 point off. The same was true for 16-9, 6 instead of 7. The one-off response is often seen in attempts

---

[7] The GAF score is:

> a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

-16-

> to exaggerate cognitive difficulties. The claimant also completed her own Function Report in adequate spelling and grammar; a person of true FSIQ64 would be most unlikely to have learned to read and write well enough to do this. That would suggest that she used to have adequate cognitive abilities, but no longer does. There is no indication of a head injury or disease process that would have caused a decline in intellect.

(*Id*.).

Dr. Lawrence then stated that he observed no indications of intellectual limitations in the field office, and further believed that text messaging – which Plaintiff engaged in while she was at the field office – is an activity that would be difficult for "a person of true FSIQ64" (*Id*.). He deemed the IQ scores obtained by Dr. Boneff invalid, and concluded that the accompanying diagnostic formulation and MSS could not be accepted as accurate (*Id*.). Dr. Lawrence concluded that Plaintiff had failed to cooperate in the consultative examination process, and had no medically determinable mental impairment – he indicated this on a psychiatric review technique form as well (Tr. 159, 161-74). He opined Plaintiff was capable of "simple work that is easy to learn" (Tr.160).

On January 31, 2011, Plaintiff's scholastic record from Denby Technical & Preparatory High School was printed (Tr. 153). Her career GPA was .842; she had earned 45 of the 95 credits required for graduation (*Id*.).

-17-

### D.  *Plaintiff's Claims of Error*

#### 1.        **Whether the ALJ Erred at Step Three**

##### a.  *Listing 12.02–Organic Mental Disorders*

Plaintiff argues that the ALJ erred in his Step Three analysis because her impairments

meet or medically equal Listing 12.02(A)(7). It reads:

> ***12.02. Organic Mental Disorders***: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
>> A. Demonstration of a loss of specific cognitive abilities or affective changes *and* the medically documented persistence of at least one of the following:
>> * * *
>>> (7) loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.[]

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02 (emphasis added)

#### i.        **"A" Criteria**

Plaintiff argues that her impairments are medically equal to Listing 12.02 because her

scholastic performance suffered following her 1999 motor vehicle accident and accompanying

brain injury. As support, Plaintiff cites to her Denby High School records and Dr. Chinarian's

2004 psychiatric evaluation, during which she reported that she had performed well in school prior to her accident (Dkt. No. 13 at p. 16).[8]

This evidence, however, does not suffice. Plaintiff's school records consist of a single page of grades listed alongside a cumulative GPA and number of total credits earned. Granted, both are remarkably low. But the single page sheds no light on the reasons for Plaintiff's poor performance. Considering the number of years that transpired between Plaintiff's 1999 injury – at which point she was just nine years old – and her time in high school, a range of factors could have accounted for Plaintiff's poor performance.[9]

And while Plaintiff points to Dr. Chinarian's 2004 evaluation as support that her mental impairments are sufficiently severe to find disability at Step Three, Dr. Chinarian's findings effectively encapsulate the problems that derive from the overwhelming lack of evidence on record: although Plaintiff reported difficulty in school following her 1999 car accident, Dr. Chinarian was unable to conclude that Plaintiff's performance in school was the result of a brain injury or other external variables, such as her family's recent relocations or inevitable

---

[8] All page numbers refer to CM/ECF pagination.

[9] Plaintiff also argues that the ALJ's failure to mention in his decision her school records – which she says were submitted within the 30 days that the ALJ kept the record open for supplementary documentation – demonstrates the ALJ's failure to base his decision on the record as a whole (Dkt. No. 13 at p. 18 (CM/ECF)). But, as discussed above, any error is harmless because the records do not provides little evidentiary support.

-19-

developmental maturation. Seeking conclusive findings, Dr. Chinarian referred Plaintiff for neuropsychological testing. But as far as the record is concerned, Plaintiff failed to follow through; she concedes this.

Nevertheless, Plaintiff also claims that the ALJ neglected to consider in full the findings of Dr. Chinarian because he failed to mention her reported need to repeat multiple grades; the purely academic nature of her problems; or, that Dr. Chinarian diagnosed Plaintiff as "status post traumatic brain injury with subsequent school failures" (Dkt. No. 13 at p. 18, citing 205-07). An ALJ must consider evidence that directly relates to whether Plaintiff's impairments satisfy a listing and provide a thorough analysis of the listings. *Christephore v. Comm'r of Soc. Sec.*, No. 11–13547, 2012 WL 2274328 at **6-7 (E.D. Mich. June 18, 2012) (finding it was impossible to determine whether substantial evidence existed to support the ALJ's third step evaluation, because the ALJ did not discuss the applicable listing). But the ALJ need not discuss every component of Dr. Chinarian's evaluation. *Kornecky*, 167 F. App'x at 508 ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"). Here, the ALJ reasonably found most telling – and most worthy of mention – Dr. Chinarian's ultimate inability to make conclusive findings as to Plaintiff's condition.

### ii.   "B" Criteria

Even if Plaintiff's impairments were sufficiently severe to meet or equal the "A" criteria, she cannot satisfy the "B" criteria. Under the regulations, Plaintiff's mental problems (i.e., the

"A" criteria) must result in at least two of the following: (1) marked restriction of activities of

daily living;[10] (2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; or, (4) repeated episodes of decompensation,

each of extended duration (i.e., three episodes within one year, or an average of once every four

months, each lasting for at least two weeks). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02.

In determining whether Plaintiff's impairments met or medically equaled the listings, the

ALJ stated:

> The claimant has mild restriction in activities of daily living, mild difficulties in
> maintaining social functioning, mild difficulties in maintaining concentration, persistence
> or pace, and no episodes of decompensation. The claimant testified at the hearing that she
> lives with her mother and her brother in a flat. Her appetite, sleep and ability to care for
> her personal needs are okay. She further testified she does help her mother with the
> household chores through she tends to forget to do things, and she likes to watch
> television and uses the computer to play games. The claimant did not report any
> significant problems with her ability to get along with family and others or her ability to
> get around and to places.
>
> Because the claimant's mental impairments do not cause at least two "marked"
> limitations or one "marked" limitation and "repeated" episodes of decompensation, each
> of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 16).

---

[10] Marked "means more than moderate but less than extreme. A marked limitation may
arise when several activities or functions are impaired, or even when only one is impaired, as
long as the degree of limitation is such as to interfere seriously with [the] ability to function
independently, appropriately, effectively, and on a sustained basis." 20 C.F.R., pt. 404, subpart P,
App. 1.

Plaintiff quotes portions of her function reports and hearing testimony to demonstrate that she has functional problems sufficiently severe to satisfy the Listings:[11] she needs reminders to take medicine, go places, or do things; does not prepare her own meals; does not go out alone (she is scared to walk alone); does not drive (has no license); cannot pay attention long; does not finish what she starts; does not follow written or spoken instructions well; does not handle stress or changes in routine well; is scared to be alone in the dark; forgets to do things (she will walk off and do something else even when her mother is standing next to her); has no recreational interests; has no friends; does not remember what month she stopped school, or whether she repeated the eighth grade more than once; forgets to tell doctors about her headaches; and, cannot keep her mind on computer games (she quickly starts thinking about something else) (Dkt. No. 13 at pp. 20-21, citing Tr. 35-39,42, 47-48, 138-42).

While accurate, the ALJ's explanation of Plaintiff's reported functional abilities is also accurate:

> The claimant [] said that she lived with her family in a house and has no problems with personal grooming or hygiene tasks. She prepared meals daily, took care of the dishes, laundry and cleaning of a bathroom and shopped for clothes in stores. She further indicated that she enjoyed watching television, dancing, playing foot ball [sic] and doing hair. She also liked to talk on the phone, text messages, and get on the computer. She reported she had no problems getting along with family, friends and neighbors, and walked or got rides to go places.

---

[11] Plaintiff statements relate to Listing 12.05(D); she does not expressly substantiate her argument that Plaintiff qualifies for the equivalent component of Listing 12.02. But the language regarding the necessary showing of functional impairment in 12.05(D) is precisely the same as that required under Listing 12.02(B). Thus, this Magistrate Judge applies Plaintiff's argument to the analysis of both Listings.

(Tr. 18). The ALJ also accurately noted that Plaintiff reported in her 2009 consultative examination that she took a bath or shower every day, got along okay with people, and liked to dance and watch television; and acknowledged Plaintiff's difficulties with memory and concentration (Tr. 21).[12]

Nor was the ALJ's evaluation of Plaintiff's functional abilities inconsistent with other findings on record. The ALJ noted that no evaluating or treating source indicated that Plaintiff was disabled; unable to sustain gainful employment because of her impairments; or, in need of restricted daily or work-related activities (Tr. 20). Dr. Boneff ultimately found that, despite Plaintiff's problems with attention and concentration, she was capable of simple work type activities (remembering and executing a two or three step procedure on a sustained basis with no capacity for independent judgment or decision making required) and noted she would likely be best at hands on activities that did not require verbal mediation or problem solving (Tr. 19, 157). The ALJ assigned Dr. Boneff's opinion significant weight (and greater weight than that assigned to Dr.

---

[12] Although the ALJ noted in another part of the decision that Plaintiff had a mild limitation in concentration, persistence, and pace, he also stated that Plaintiff had a moderate impairment in this category. In adopting Dr. Boneff's findings, the ALJ's RFC provides for more accommodation than one would expect to be required for an individual with only mild limitations.

-23-

Lawrence),[13] and incorporated each component of Dr. Boneff's findings into his RFC (Tr. 17).

Notably, Plaintiff does not contest the ALJ's weight of the medical opinion evidence. Moreover, the ALJ's adverse credibility finding – as discussed below in full – is reasonable and supported by substantial evidence. This Magistrate Judge is satisfied that the ALJ thus reasonably considered all evidence pertaining to Plaintiff's reported functional abilities and resolved any conflicting statements in a light most consistent with the record as a whole. His determination that Plaintiff did not meet or equal the criteria for Listing 12.02 is supported by substantial evidence.

### b.  Listing 12.05 – Mental Retardation

Plaintiff also argues that the ALJ erred by failing to consider whether Plaintiff's impairments met or medically equaled Listing 12.05(C) or (D). She relies on *Reynolds* to demonstrate that the ALJ's failure to assess Listing 12.05 constitutes reversible error. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011). But in *Reynolds*, the Sixth Circuit reversed because the ALJ's Step Three analysis only addressed the plaintiff's mental impairment; the ALJ entirely neglected to consider whether the

---

[13] The ALJ acknowledged that Dr. Boneff's evaluation was derived from an opportunity to examine Plaintiff, while Dr. Lawrence was only able to review the available medical records, "which w[ere] very limited [] in this case" (Tr. 20).

plaintiff's physical impairment met a listing, despite finding at Step Two that the claimant had severe physical and mental impairments. *Id.* at 415. This is not such a case.

Meanwhile, Defendant states the ALJ was under no obligation to consider Listing 12.05 because Plaintiff cannot satisfy the prerequisite for meeting Listing 12.05: mental retardation.

Listing 12.05 reads:

> **12.05** *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05; s*ee Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("[A] claimant will meet the listing for mental retardation only if the [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria[.]") (internal quotations marks omitted). Assuming Listing 12.05 were applicable, any error in the ALJ's failure to address it is harmless.

### i.   "C" Criteria[14]

Listing 12.05(C) requires that Plaintiff show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

---

[14] Defendant does not contest the validity of Dr. Boneff's IQ scores, which place Plaintiff squarely within the applicable range.

"[T]he purpose of § 12.05C is to compensate a claimant with an IQ in the 60-70 range *and* a limitation of function that affects his work." *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir. 1997) (quoting *Sird v. Chater*, 105 F.3d 401, 403 n.6 (8th Cir. 1997)) (emphasis added). Plaintiff has the burden to demonstrate his impairments satisfy listing 12.05(C).  *See Foster*, 279 F.3d at 354. An actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), but the ALJ may consider the fact that no such diagnosis exists. *See Hardiman v. Astrue*, No. 3:11–cv–665, 2012 WL 684843 at *7 (N.D. Ohio March 2, 2012) (citation omitted).

Plaintiff argues that her headaches – which cause her to go to sleep – constitute the additional significant work-related limitation of function necessary to satisfy the listing; she states that headaches "can also be a sequelae to traumatic brain injury" (Dkt. No. 13 at p. 19). That they *can* be so does not necessarily mean that Plaintiff's headaches are the assured result of her brain injury. Regardless, the infrequency and lack of severity of Plaintiff's headaches makes her point unconvincing. Plaintiff testified that these headaches come and go quickly: they last approximately five minutes; for relief she either does nothing or goes to sleep. And although Ms. Bason indicated that Plaintiff sometimes sleeps throughout the day, it is not entirely clear that Plaintiff's need to sleep is related to Plaintiff's headaches (Dkt. No. 13 at p. 19, citing Tr. 50).

The ALJ's decision expressly addressed this evidence:

At the hearing, claimant reported struggling with headaches, 3 times a day . . . . She, however, candidly admitted that the headaches last for only 5 minutes and she has had no treatment for the problem. . . . The claimant's mother testified that her daughter just recently told her about the headache so there has been no physician visit for the condition. Consistent with the testimony of the claimant and her mother, there is no indication in the record of required ongoing or continuous evaluation, treatment, therapy

-26-

> or management of the allegedly disabling headache . . ., or for [its] complications or exacerbations. . . . Rather, the record documents little for any treatment, therapy, and/or medication management for the headache[.]

(Tr. 15). There is simply insufficient evidence on record to carry Plaintiff's argument that her impairments are sufficiently severe to meet or equal Listing 12.05(C).

### ii.    "D" Criteria

Listing 12.05(D) requires the following:

> A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) Marked restriction of activities of daily living; (2) Marked difficulties in maintaining social functioning; (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(D). Thus, it requires Plaintiff to make the same showing required to satisfy listing 12.02(B). As explained above with respect to  Listing 12.02(B), the ALJ's finding that Plaintiff does not have functional limitations sufficiently severe to qualify as disabled under the Listings is supported by substantial evidence.

### 2.        Credibility

Plaintiff next argues that the ALJ erred in evaluating her credibility. The Sixth Circuit has recently instructed ALJs on how to assess a claimant's credibility:

> Credibility determinations regarding the applicant's subjective complaints of pain rest with the ALJ and are afforded great weight and deference as long as they are supported

> by substantial evidence. In assessing an individual's credibility, the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged . . . . Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions.

*Johnson v. Comm'r of Soc. Sec.*, __F. App'x __, 2013 WL 5613535, at *8 (6th Cir. Oct.15, 2013) (internal citations and quotations omitted). The ALJ is not required to address every factor; he need only identify specific reasons for his credibility determination – supported by evidence in the record – and clearly state the weight he gave to Plaintiff's statements and the reasons for that weight. *Potter v. Colvin*, No. 3:12–CV–202, 2013 WL 4857731, at *13 (E.D. Tenn. Sept.11, 2013) (citing SSR 96–7p, 1996 WL 374186, at *2 (1996); *Tell v. Comm'r of Soc. Sec.*, No. 11–15071, 2012 WL 3679138, at *11 (E.D. Mich. July 13, 2012)). Furthermore, "[c]redibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ." *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 54472803, at *8 (W.D. Mich. Sept. 30, 2013) (citing *Gooch v. Sec'y of HHS*, 833 F.2d 589, 592 (6th Cir. 1987)). This Magistrate Judge finds the ALJ provided sufficient reasons for his adverse credibility finding.

-28-

The ALJ first found that Plaintiff had medically determinable impairments that could reasonably be expected to cause her alleged symptoms (Tr. 18). However, in his evaluation of Plaintiff's subjective complaints, the ALJ did not find her statements concerning the intensity, persistence, and limiting effects of her symptoms fully credible (*Id.*).

Plaintiff's credibility argument is rooted in a proposition that the ALJ failed to fully appreciate the repercussions of her brain injury. Plaintiff bases her argument on the ALJ's statement that Plaintiff was not motivated to work. This statement was made within the context of discussing Plaintiff's lack of work history, which, while not dispositive, is hardly an irrelevant consideration in credibility assessments:

> The undersigned must also consider the claimant's work history. The record and testimony at hearing reveals that the claimant has never worked. In fact, since quitting her life skill program, the claimant has not looked for any other training or tried to learn a new trade. She has not filled out a job application and tore up applications her mother completed for her. The evidence indicates that the claimant is not motivated to work, subjective statements made in connection with claims for public benefits must be viewed closely

(Tr. 20).

But more importantly, it is not the only reason for which the ALJ discounted Plaintiff's credibility. More likely, it was a tangential consideration, dwarfed by a much weightier issue: the lack of record evidence and its effect on the ALJ's perception of Plaintiff's credibility. Prior to the above portion of the ALJ's decision, he provided a thorough and accurate analysis of his credibility assessment, consistent with factors required under the regulations. In part, the ALJ stated:

-29-

> [T]here is minimal information in the medical record of any allegedly disabling impairment[s], symptoms or limitations. The claimant testified that she tended to forget to do things and cannot keep her mind on things and feels sad at times. However, except for one consultative evaluation in September 2009, there is no indication that she sought, required or received any medical treatment or behavioral health therapy for her allegedly disabling condition and symptoms. There is no indication that the claimant required emergency room visit, surgery, hospitalization, treatment or therapy and counseling because of complications or exacerbations. In fact, there is no treatment or therapy documented for any allegedly disabling conditions and symptoms since 2004.

(Tr. 18).

Nevertheless, Plaintiff insists that the ALJ's analysis is marred by a failure to appreciate the presence and implication of her traumatic brain injury. In support of her position, Plaintiff includes references to studies from medical journals that elaborate on the effects of traumatic brain injury, and posits as follows:

> It is our assertion that [Plaintiff] suffered from such a long-lasting cognitive impairment due to the traumatic brain injury she sustained when she flew from the back seat of a motor vehicle, through the windshield and onto the ground at the age of 9. The sequelae from this injury has been long lasting and has affected plaintiff's ability to even complete a high school education, which she continued to attempt []through the age of 20.

(Dkt. No. 13 at pp. 24-25).

While perhaps helpful in an academic sense, these extraneous sources – among them Plaintiff's own attempt to play doctor – cannot supplant conclusive findings, including documented treatment for or diagnosis of impairments related to traumatic brain injury, or any other cognitive impairment for that matter. Simply put, an ALJ is not obligated to resolve a sparse medical record in favor of a finding of disability. Nor can this Court reweigh the evidence and substitute its own judgment for that of the ALJ. *See Brainard v. Sec'y of Health and Human*

-30-

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (internal citation omitted). The ALJ's credibility assessment is supported by substantial evidence and should not be disturbed on appeal.

## IV.   CONCLUSION

Because the ALJ did not err in his Step Three analysis or assessment of Plaintiff's credibility, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court. The response shall address

each issue contained within the objections specifically and in the same order raised.

<u>s/Mark A. Randon</u>
Mark A. Randon
United States Magistrate Judge


Dated:  February 18, 2014



<u>*Certificate of Service*</u>

 *I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, February 18, 2014, by electronic and/or ordinary mail.*

<u>*s/Eddrey Butts*</u>
*Case Manager for Magistrate Judge Mark A. Randon*